# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

ALBERT R. MCCANCE, JR.,      )
     Plaintiff,           )
                            )
     v.                     )     CAUSE NO.: 2:04-CV-538-PRC
                            )
JO ANNE B. BARNHART,      )
Commissioner of the Social Security   )
Administration,            )
     Defendant.           )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 5], filed by the Plaintiff, Albert R. McCance, Jr., on January 6, 2005, and an Opening Brief [DE 16], filed by Mr. McCance April 29, 2005. Mr. McCance seeks judicial review of a final decision of the Defendant, the Commissioner of the Social Security Administration ("Commissioner"), in which Mr. McCance was found no longer to be entitled to continued Disability Insurance Benefits under Title II of the Social Security Act. For the following reasons, the Court denies Mr. McCance's request to reverse and remand the decision of the Commissioner.

## PROCEDURAL BACKGROUND

On April 3, 1996, Mr. McCance filed an application for Social Security Disability Benefits, which was approved on May 24, 1996, and Mr. McCance began receiving benefits. Mr. McCance was awarded disability benefits based on meeting Listing §11.05A of 20 C.F.R. § 404, Subpart P, Appendix 1, for benign neoplasm of the brain.

Following a Continuing Disability Review by the Social Security Administration ("SSA"), on September 6, 2000, Mr. McCance received a notice that he was no longer disabled as of September 6, 2000, and that his disability income benefits would cease as of November 30, 2000.

Mr. McCance filed a timely Request for Reconsideration, which, after a hearing held on January 16, 2001, was denied on February 13, 2001. He then filed a timely request for a hearing on April 3, 2001, and the hearing was held on March 7, 2002. At the hearing, Administrative Law Judge ("ALJ") Dennis R. Kramer ("ALJ") noted that updated memory testing was needed. A supplemental hearing was held on October 16, 2002. At that hearing, the ALJ admitted additional evidence into the record, including the consultative psychological examination. Mr. McCance was represented by counsel at both hearings, Thomas Grzesik testified as the vocational expert ("VE") at the March hearing, and Frank Mendrick testified as the VE at the October hearing.

In a February 25, 2003[1] decision, the ALJ denied Mr. McCance's application and found Mr. McCance no longer disabled, affirming the cessation determination. The ALJ made the following findings:

(1)    The claimant was found to be disabled within the meaning of the Social Security Act beginning February 13, 1996, and has not engaged in disqualifying substantial gainful activity since that date.

(2)    The medical evidence establishes that the claimant currently has a cognitive disorder, not otherwise specified and benign neoplasm, impairments that are severe. He has a non-severe impairment of epilepsy.

(3)    The medical evidence establishes that the claimant currently does not have an impairment or a combination of impairments, which meets or equals the severity of an impairment listed in Appendix 1, Subpart P, Regulation No. 4.

---

[1] Although the decision is date stamped February 25, 2002, it appears that the correct date must be February 25, 2003, because the hearings were held in March and October 2002.

(4)     The primary severe impairment present as of May 14, 1996, the date of the most recent favorable medical decision that the claimant was disabled, was a brain tumor.

(5)     The medical evidence establishes that there has been improvement in the claimant's medical condition since May 24, 1996.

(6)     The medical improvement is related to the claimant's ability to work.

(7)     The medical evidence establishes that the claimant currently has an impairment, or combination of impairments, that is severe.

(8)     The evidence does not support the claimant's subjective complaints to the extent alleged.

(9)     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

(10)    The claimant has been capable of performing a limited range of light exertional work activity since at least September 6, 2000.

(11)    The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

(12)    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

(13)    The claimant has a "high school education" (20 CFR § 404.1564).

(14)    The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

(15)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

(16)    Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as a general assembly [sic], general inspection [sic], general hand packer, assembly and inspection [sic]. A finding of "not disabled" is therefore reached within the framework of the above-cited rule.

3

(17)   The claimant has not been under a continuing disability, as defined in the Social Security Act, since September 6, 2000 (20 CFR § 404.1520(f)).

R. at 21-22.

On March 13, 2003, Mr. McCance filed a Request for Review of Hearing Decision.  In the appeal, Mr. McCance included additional progress notes from Dr. Edward Mkrdichian for the period of April 2001 through April 2003, which the Appeal Council incorporated as part of the record.  The Appeals Council denied Mr. McCance's request for review on October 22, 2004.  Therefore, the ALJ's decision of February 25, 2003, is the final decision of the Commissioner.

A Complaint for Judicial Review was timely filed by Mr. McCance with this Court on January 6, 2005.  On April 29, 2005, Mr. McCance filed an Opening Brief.  On July 14, 2005, the Commissioner filed a Defendant's Memorandum in Support of Commissioner's Decision.  Mr. McCance then filed a Plaintiff's Response to the Defendant's Memorandum in Support of the Commissioner's Decision on August 8, 2005.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A. Background Information

Mr. McCance was born in 1953 and was 49 years old at the time of the hearing.  Mr. McCance is 5'8" tall and weighs 220 pounds.  He has a high school education and has past relevant work experience as a millwright.  Mr. McCance filed for disability income benefits based on his

cognitive disorder, causing short and long term memory loss, a seizure disorder, fatigue, and a benign tumor.

In February 1996, Mr. McCance underwent a right frontotemporal craniotomy for tumor resection and partial frontal lobectomy for a history of seizures and brain tumor.  On May 24, 1996, Mr. McCance was approved for DIB benefits because of neoplasm of the brain.  Mr. McCance is not presently engaged in any substantial gainful activity.  Mr. McCance alleges that he is still disabled based on his brain tumor and cognitive disorder.

## B.  Medical Evidence

In December 1994, January 1995, and February 1996, Mr. McCance experience seizures. A neurodiagnostic work-up and magnetic resonance imaging ("MRI") scan in February 1996 revealed a right frontal brain tumor.   In February 1996, Edward H. Mkrdichian, M.D., Mr. McCance's surgeon, performed brain surgery and a resection of Mr. McCance's tumor.  Pathology reports were consistent with diffuse oligodendroglial neoplasm, which was histologically a lower-grade glioma, but had growth and spread characteristics of a higher grade tumor.  Accurate grading of this particular tumor was difficult, due to its aggressive growth and spreading characteristics.

Kamala B. Modur, M.D., reported that Mr. McCance had completed radiation therapy to the frontoparietal lobe of his brain on April 19, 1996.  According to Dr. Modur, Mr. McCance tolerated his treatments quite well.

From May 1996 to December 2000, Dr. Mkrdichian treated Mr. McCance.   In an undated letter, Dr. Mkrdichian reported that Mr. McCance remained under his medical supervision with a diagnosis of Oligodendroglioma, that "there is not a cure for high grade gliomas," and that the

tumors are rarely ever completely resected, requiring repeated surgeries and treatment including chemotherapy, radiation, and stereotactic radiosurgery. Dr. Mkrdichian further opined that Mr. McCance's prognosis is poor, and requested that the Disability Determination Bureau reconsider Mr. McCance's claim of disability. In the letter, Dr. Mkrdichian referenced the most recent MRI of the brain, obtained 5/1/96, showing the right frontal resection site with a "very thin, small rim of enhancement most probably consistent with postoperative changes; however, residual tumor cannot be ruled out. I have recommended that he return to see me for another MRI and follow-up in 2 months." R. at 234.

Dr. Mkrdichian saw Mr. McCance at a follow-up visit on May 3, 2000. Dr. Mkrdichian noted that Mr. McCance reported that he was doing very well and had no complaints. Dr. Mkrdichian opined that neurologically, Mr. McCance was grossly within normal limits and his wound had healed well. He further indicated that the most recent MRI showed no change when compared with the MRI from six months earlier and that there was no evidence of recurrent tumor. His impression was that Mr. McCance was doing well and recommended that Mr. McCance take Tegretol and return for follow-up in six months.

In May 2000, approximately four years after surgery, Dr. Mkrdichian reported that Mr. McCance was doing very well, and an MRI scan of the brain showed no recurrent tumor. Mr. McCance's neurological condition was within normal limits, and his wound healed well. He took Tegretol, 1,000 mg. per day. Mr. McCance had no complaints and reported he was doing very well.

On July 25, 2000, Dr. Yong Song performed a consultative examination of Mr. McCance, evaluating all of his conditions, including his history of brain tumor and epilepsy. Dr. Song reported that Mr. McCance had not had a seizure for four years but noted that Mr. McCance had been taking

6

Tegretol.  However, Mr. McCance reported that the Tegretol often makes him tired and "it is difficult to make a whole day without an afternoon nap."  On examination, Mr. McCance demonstrated a normal gait on a level surface.  He was able to walk on tip toe and heel; however, tandem walking showed some balance problems.  He was alert and oriented to his surroundings, and he was cooperative.  His attention span was within a normal range of function.  His neurological examination showed no significant deficits.  According to Dr. Song, Mr. McCance's cognitive functioning was intact in terms of short memory span, abstract reasoning, and reading.  Dr. Song diagnosed status post brain surgery and removal of glioma through right frontal lobectomy.

In August 2000, as an addendum to Dr. Song's report, Mr. McCance's muscle strength and dexterity was tested.  His muscle strength in his right arm, hand, and leg was completely normal, and in his left arm, hand, and leg was good.  He had a normal gait, except for tandem fashion walking. He was able to perform fine finger manipulation, such as buttoning, zipping, and picking up coins.

On December 4, 2000, Dr. Mkrdichian reported that Mr. McCance's post operative follow-up included Tegretol to control seizures.  MRI scans were completed on a six-month basis to monitor for possible recurrence, and at that time, Mr. McCance's condition was stable.  Dr. Mkrdichian reported that Mr. McCance continues to suffer from short-term memory loss and that as a result, he is considered disabled from all employment.  Dr. Mkrdichian opined that Mr. McCance's condition is not expected to improve.

By referral of the Disability Determination Office for the Social Security Department, on May 6, 2002, psychologist Caryn Brown, Ph.D., conducted a Mental Status Examination, Weschler Adult Intelligence Scale, Weschler Memory Scale, and MMPI-2 test on Mr. McCance.  On examination,  Mr. McCance reported that he was disabled due to seizures and neurological

7

dysfunction. He was oriented in three spheres and had no hallucinations, delusions, suicidal ideation, or psychosis. His hygiene, mood, and affect were appropriate. He had a fair number of friends, and he could handle routine daily activities, such as preparing simple meals, doing laundry, and shopping without assistance. Memory testing showed that Mr. McCance correctly identified one of three items correctly after five minutes, recalled his previous evening's meal without hesitation, and recalled a recent news event without hesitation and with detail. He recited five digits forward and backward. He completed serial seven subtraction in 28 seconds. He demonstrated an average ability to sustain his concentration and attention. His mood and affect were appropriate. His thought processes were logical. Mr. McCance had slow processing speed and a strength in his ability to produce geometric designs using blocks. A Weschler's Memory Scale-III showed that Mr. McCance had a general memory index of 91, which suggested that his overall memory functioning fell within the average range.

Dr. Brown found that Mr. McCance had a Global Assessment of Functioning rating of 65. She noted that he might have "slight" difficulty in understanding and remembering detailed instructions, carrying out detailed instructions, and the ability to make judgments on simple work-related decisions. She rated Mr. McCance as average in fund of information, memory, mathematical reasoning, practical judgment, abstract reasoning, and ability to sustain his concentration and attention. She noted, "Mr. McCance presents with some mild dysfunction with his cognitive executive functioning. His deficits are diffuse and mild but appear to undermine his daily functioning." R. at 315. She opined that he would have slight difficulty in responding appropriately to work pressures and changes in a routine work setting. She found that Mr. McCance was able to manage his own financial affairs.

Dr. Brown also provided an IQ score of 103 for Mr. McCance.  On June 4, 2002, Mr. McCance provided a copy of his school records, which included an IQ score of 125 in the fifth grade in 1970.[2]


## C.  Reviewing Physician Opinion

On August 28, 2000, adjudicator Eileen Sigmain completed a Worksheet for Continuing Disability Review.  She noted that Mr. McCance had had an "aggressively spreading tumor," but concluded that Mr. McCance's condition had medically improved because Mr. McCance underwent therapy and "has no signs and has been free for 4 years."  R. at 299A.

In August 2000, a non-examining, DDS physician, Dr. Steven Roush, completed a Physical Residual Functional Capacity Assessment for Mr. McCance.  Dr. Roush's assessment indicated that there were not any treating or examining source statements regarding Mr. McCance's physical capacities in the file.  Dr. Roush found that Mr. McCance could occasionally lift 20 pounds and frequently lift 10 pounds, could stand or walk for six of eight hours a day, could sit for six of eight hours a day, and was unlimited in push and pull.  He noted left grip strength of four out of five and

---

[2]  Mr. McCance submitted approximately eleven pages of medical evidence to the Appeals council with his request for review of the ALJ's decision.  The evidence included progress notes from Dr. Mkrdichian for the period from April 2001 to April 2003.  The notes showed that Mr. McCance was doing well and following a stable course.  The Appeals Council reviewed the evidence and found that it did not provide a basis for changing the ALJ's decision.  This evidence is not before the Court for substantial evidence review as it was not before the ALJ.  *See Diaz v. Chater*, 55 F.3d 300, 305 n.1 (7th Cir. 1995).  The Court may review the evidence submitted after the ALJ's decision in conjunction with a sentence six remand.  *See Eads v. Secretary of Health and Human Srvcs.*, 983 F.2d 815, 817 (7th Cir. 1993).  The Social Security Act permits the Court to remand, without ruling on the merits, if new and material evidence is submitted, and the claimant shows good cause for failing to submit the new evidence during the administrative proceedings.  42 U.S.C. § 405(g).  However, none of this evidence submitted to the Appeals Council should provide a basis for remand, because it was not material.  It either concerns conditions already considered and accommodated by the ALJ or concerns evidence of Mr. McCance's condition after the ALJ's decision on February 25, 2003.  *See Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).  Although Mr. McCance cites to Appeals Council evidence in support of his arguments in opposition to the ALJ's decision, he does not identify it as such or argue that such evidence provides a basis for remand under sentence six of 42 U.S.C. § 405(g).  Thus, he has waived these arguments.

right grip strength of five out of five with normal fine motor skills. He identified occasional postural limitations with no climbing. Finally, Dr. Roush found Mr. McCance credible.

On November 8, 2000, another DDS consultant, Dr. J. Gaddy, made the same findings and found Mr. McCance credible in a subsequent Physical Residual Functional Capacity Assessment.

### D.  Statements and Testimony of the Plaintiff

In May 2000, Mr. McCance filed a Report of Continuing Disability Interview, describing his disabling condition of his brain tumor for which he had been receiving disability benefits. He reported that he still regularly takes Tegretol 1000 mg, 4x daily. Mr. McCance stated that every six months, he returns to the Chicago Institute of Neurosurgery for an MRI and he visited his treating surgeon, Dr. Mkrdichian.

In his April 2001 Request for Hearing by ALJ, Mr. McCance noted that he had difficulty in concentration, comprehension, and "remembering simple day-to-day tasks." R. at 79.

At the hearing on March 7, 2002, Mr. McCance testified that he "wears out" easily and needs to rest after three or four hours. R. at 346. He stated, "I wear out easy, but I haven't been working so, I don't know if that would have something to do with it, or if it's just." *Id*. He noted that he would need to sit down or take naps in the afternoon. The naps may last thirty to forty minutes every afternoon in a normal eight-hour work day. He further testified that he is now limited to physical activity such as fishing or archery once or twice a month. He volunteers at the Griffith Isaak Walton League but only takes on tasks that do not require concentration, such as mowing the lawn. He testified, "everything's volunteer so I try and keep myself away from something that'll take a lot." R. at 351. The league members need to call him to remind him about special meetings.

Mr. McCance also testified that he continues to experience short-term memory problems since May 1996. He stated that even if he writes down tasks, he forgets to do them anyway. He testified that he remembers conversations with people for at least the same day.

Mr. McCance lives with his father in an apartment. He is able to clean, shop, and cook each day.

### E. Testimony of Vocational Expert

At the March 2002 hearing, the VE testified, based on Mr. McCance's age, education, and past work experience, that a hypothetical individual would not be able to perform Mr. McCance's past relevant work as a millwright.

At the October 2002 hearing, the VE found that Mr. McCance would not be able to return to his past work based on a slight loss of ability to understand and carry out detailed work. However, the VE found that a hypothetical individual with Mr. McCance's age, education, and work experience, who retained the capacity to perform light exertion work, that required no more than occasional postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling, and accommodated a slight loss of ability to understand and carry out detailed work, deal with work pressures, and deal with changes in the work setting, would be able to perform semi-skilled, light work as a general assembler and general inspector. Although the VE recognized the difficulties in following directions in Mr. McCance's past work, the VE found that Mr. McCance's problems were only "slight" and "it's still reasonable to expect the person to do semi-skilled work, where the measures aren't as precise as actually in building, and maintaining equipment." R. at 377. The VE noted, however, that the semi-skilled jobs are "not very complex, but however they are

11

somewhat detailed." R. at 378.  The VE also testified that Dr. Brown did not limit Mr. McCance's ability to show up to work consistently because of his brain impairment.  The VE testified that there are approximately 10,000 semi-skilled assembly jobs and 8,000 semi-skilled inspection jobs in the regional Chicago metropolitan/Northwestern Indiana economy.  For unskilled positions, the VE cited 10,000 general packing and hand packing jobs at the light level, 8,000 assembly jobs, and 4,000 inspection jobs.  The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT").

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security

Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. § 404.1520. However, once a Social Security claimant is found to be disabled, the agency "must evaluate the claimant's impairments 'from time to time to determine if [the claimant is] still eligible for disability benefits.'" *Johnson v. Apfel*, 191 F.3d 770, 774 (7th Cir. 1999)(quoting 20 C.F.R. § 404.1589) (alteration in original); *see also Jackson v. Massanari*, No. IP00-1569-C-H/G, 2001 WL

1175094, at *2-3 (S.D. Ind. Aug. 14, 2001).  This review proceeds in a distinct eight-step inquiry:
(1) is the claimant engaging in substantial gainful activity?  (2) If not, does the claimant have an
impairment or combination of impairments which meets or equals the severity of a listed
impairment? (3) If not, has the claimant experienced "medical improvement as shown by a decrease
in medical severity"?  If medical improvement exists, (4) is it related to the claimant's ability to
work?  If no medical improvement exists *or* the medical improvement is not related to the claimant's
ability to work, (5) do any of the exceptions set forth in the relevant regulation apply?  (6) If the
medical improvement impacts the claimant's ability to work or if certain exceptions apply, does the
claimant's current impairments in combination remain severe?  (7) If the impairment(s) is severe,
can the claimant nonetheless engage in his previous work?  (8) If the claimant cannot engage in his
previous work, does he retain the RFC to do other work?  *See* 42 U.S.C. § 423(f); 20 C.F.R. §
404.1594(f); *see also Jones v. Shalala*, 10 F.3d 522, 524-26 (7th Cir. 1993); *Jones v. Barnhart*, No.
04 C 3532, 2005 WL 66072, at *8 (N.D. Ill. Jan. 10, 2005); *Lewis v. Barnhart*, 201 F. Supp. 2d 918,
931 (N.D. Ind. 2002).  The claimant will be found not disabled if the answer is affirmative at steps
one, five, seven, or eight, or if the answer is negative at step six.  *See* 20 C.F.R. § 404.1594(f).

 An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the
reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the
important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55
F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not
required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis
must provide some glimpse into the reasoning behind [the] decision to deny benefits."  *Zurawski*,
245 F.3d at 888.  The ALJ must build an "accurate and logical bridge from the evidence to his

14

conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).


### THE ALJ'S DECISION

The ALJ found that, since September 6, 2000, Mr. McCance "medically improved to the extent that he regained the ability to make a successful adjustment to perform other work that exists in significant numbers in the national and regional economy, despite his impairment limitations." R. at 15.  The ALJ found that Mr. McCance has not engaged in substantial gainful activity and Mr. McCance's impairment based upon his brain tumor does not meet or equal the criteria of any listing contained in the Listings of Impairments of Appendix 1 to Subpart P of Regulation No. 4.

At Step 3, the ALJ concluded that there had been medical improvement since the comparison point decision on May 24, 1996, when Mr. McCance was originally found disabled. The ALJ found that the medical evidence indicates that Mr. McCance has not had a recurrence of his brain tumor and had been free of seizures.   At Step 4, the ALJ relied on the neurological consultative examination of Dr. Song and noted that "neurological exam showed no significant deficits" and that Dr. Song found no seizures in the past four years.   The ALJ also relied on the psychological evaluation of Dr. Brown who found that Mr. McCance's cognitive disorder would cause him only "slight" difficulties in carrying out detailed instructions.   The ALJ thus concluded that Mr. McCance's medical improvement is related to his ability to work under Step 4.  The ALJ found that

Mr. McCance's statements regarding his brain tumor and his cognitive disorder were "not entirely credible or supported by the medical evidence." R. at 19.

The ALJ found Mr. McCance had the residual functional capacity ("RFC") to perform light work, but notes that his RFC is diminished by significant non-exertional limitations, which "make it impossible for him to perform complex tasks (i.e. more than simple one, two or three-step job tasks), or jobs involving more than low stress." R. at 19-20. Although the ALJ found that Mr. McCance could not perform his past work, he did find that the Medical-Vocational Guidelines would find him "not disabled" based on his age and whether he could perform the full range of light work. Because Mr. McCance has significant non-exertional limitations, the ALJ relied on the VE's testimony. Relying thereon, the ALJ found that Mr. McCance's disability ceased as of September 6, 2000, and that beginning in September 2000, he could perform a significant number of jobs in the national economy, including work as "a general assembly [sic], general inspection [sic], general hand packer, assembly and inspection [sic]." R. at 22.

## ANALYSIS

In his Opening Brief, Mr. McCance argues that the ALJ's decision is not based upon substantial evidence and should not be affirmed, but remanded. Specifically, he argues that (1) the ALJ improperly found that there was medical improvement regarding Mr. McCance's impairments; (2) the ALJ improperly discounted Mr. McCance's credibility; (3) the ALJ improperly found that Mr. McCance had the RFC to perform light work and had transferable skills; and (4) the Commissioner does not meet her burden at Step 8 to prove that Mr. McCance can perform the light work positions. In response, the Commissioner argues that the ALJ's decision that Mr. McCance

16

has improved medically and the ALJ's RFC and Step 8 findings are supported by substantial evidence.

## A.  Medical Improvement

Mr. McCance argues that the ALJ did not meet his burden at Step 3 to prove that Mr. McCance's condition has medically improved since the comparison point date because the ALJ erred by focusing on Mr. McCance's lack of seizures as an indication that his condition has improved and by discounting medical evidence that suggests Mr. McCance's condition will not improve.        At Step 3 of the eight-step analysis utilized to evaluate whether a claimant's disability has ceased or continues, the ALJ must determine whether there has been any medical improvement when the claimant's impairments do no meet or equal the Listings.  This determination is "made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence *or* absence of disability being drawn from the fact that the individual has previously been determined to be disabled."  42 U.S.C. § 423(f) (emphasis added); *see also* 20 C.F.R. § 404.1594(b)(6).

The regulations define "medical improvement" as

any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528).

20 C.F.R. § 404.1594 (b)(1).[3]  To determine whether medical improvement has occurred, the severity of the beneficiary's current medical condition is compared to the severity of the condition "at the time of the most recent medical decision that you were disabled."  20 C.F.R. § 404.1594(b)(1).  The date of the most favorable medical decision is called the "point of comparison," 20 C.F.R.§ 404.1594(b)(7), which is referred to as the "comparison point date."

In this case, the ALJ found the comparison point date to be May 24, 1996, the date of the most recent favorable medical decision that Mr. McCance was disabled.  Therefore, to determine whether Mr. McCance has experienced any medical improvement of his condition, the severity of his condition on the comparison point date of May 24, 1996, must be compared to its severity on September 6, 2000, the date the ALJ found his disability had ceased.

In his decision, the ALJ first noted that at the comparison point date, Mr. McCance could not perform any work activity due to a brain tumor.  The ALJ then recognized that Mr. McCance had surgery and three months subsequent to the surgery underwent radiation treatment and that since the surgery, the evidence indicates that Mr. McCance had gone almost five years with no evidence of recurrence of the brain tumor and that his neurological findings are stable.  Nevertheless, the ALJ acknowledged that, even though he had had no recurrence of the tumor, short-term memory loss

---

[3] Example 2, found in § 404.1594(b)(1), provides a scenario with implications in this case:
You were awarded disability benefits due to rheumatoid arthritis. At the time, laboratory findings were positive for this condition. Your doctor reported persistent swelling and tenderness of your fingers and wrists and that you complained of joint pain. Current medical evidence shows that while laboratory tests are still positive for rheumatoid arthritis, your impairment has responded favorably to therapy so that for the last year your fingers and wrists have not been significantly swollen or painful. Medical improvement has occurred because there has been a decrease in the severity of your impairment as documented by the current symptoms and signs reported by your physician. Although your impairment is subject to temporary remission and exacerbations, the improvement that has occurred has been sustained long enough to permit a finding of medical improvement. We would then determine if this medical improvement is related to your ability to work.
20 C.F.R. § 404.1594 (b)(1) (Example 2).

continues to present a problem.  He further observed that Mr. McCance had been free of seizures and that findings from a recent consultative evaluation was consistent with serial evaluations by Dr. Mkrdichian.  As a result, the ALJ concluded that Mr. McCance's overall medical condition has improved since the comparison point date "as he was nearing the five-year mark with no recurrence of his brain tumor."  R. at 16.

The Court finds that substantial evidence supports the ALJ's finding that Mr. McCance experienced medical improvement based on the lack of recurrence of the tumor.  At the comparison point date, Mr. McCance was found disabled based on Listing 11.05A.  However, Mr. McCance's brain tumor was successfully treated with surgery and radiation therapy, and he had had no recurrence or spread of the tumor in the almost five years since the surgery, as demonstrated by regular MRIs and corresponding records from Dr. Mkrdichian, his treating physician.  In addition, his seizures have been successfully controlled with Tegretol.  As a result, the medical evidence demonstrates that Mr. McCance no longer met the requirements of the Listing for that disease on September 6, 2000, which had initially qualified him for benefits.  Moreover, in finding that Mr. McCance's condition had improved, the ALJ relied on the objective medical findings from Mr. McCance's treating physicians, the opinions of examining physician Dr. Song, the opinions of examining psychologist Dr. Brown, and Mr. McCance's successful treatment history and activities.

As argued by Mr. McCance, the primary issue in considering Mr. McCance's continued disability is the severity of his brain tumor.  Mr. McCance had brain surgery in February 1996, shortly before he was awarded disability benefits.  At that time, his surgeon indicated that the grade of tumor was difficult to determine because it had characteristics of both low-grade and high-grade tumors.  After the surgery and radiation therapy, his doctors agreed that his treatment had been

19

successful and he was doing very well.  Over the following years, Mr. McCance followed up with his physicians approximately every six months, and the MRIs performed in conjunction with the visits demonstrated no further spread or recurrence of the tumor.  Four years later, in May 2000, Dr. Mkrdichian opined that Mr. McCance was doing very well, he had no signs of recurrent tumor, he had normal neurological functioning, and he had no complaints.  In December 2000, Dr. Mkrdichian opined that Mr. McCance's seizures were controlled with Tegretol and that his MRI scans showed no recurrence of the tumor.

In addition, Dr. Song, the physician who examined Mr. McCance on July 25, 2000, at the request of the state agency, found that Mr. McCance had a normal examination, showing a normal gait, normal neurological findings, and normal cognitive functioning.  His short term memory, abstract reasoning, and reading ability were intact.  Mr. McCance's muscle strength was good to normal in his arms, hands, and legs, and he had good abilities to perform fine dexterity maneuvers. A state agency physician reviewed this evidence and concluded that Mr. McCance was able to perform light work with occasional postural limitations.

The record also demonstrates that Dr. Mkrdichian opined that the tumor would never be completely cured.  Although Mr. McCance continues to be monitored on a regular basis for possible recurrence of his brain tumor, the significant amount of time that has passed since his surgery without recurrence of the tumor permits a finding of medical improvement.  *See* 20 C.F.R. § 404.1594(b)(1) (Example 2).

Mr. McCance argues that the ALJ did not credit Dr. Mkrdichian's December 4, 2000 opinion that Mr. McCance's condition will continue and relied instead on the opinions of non-examining physicians Dr. Roush and Dr. Gaddy, on the consultative examination of Dr. Song, and on the

consultative examination of Dr. Brown.  A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(d)(2); *Boiles*, 395 F.3d at 426 (citing *Clifford*, 227 F.3d at 870); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances."  *Gudgel*, 345 F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).  However, an ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Dixon*, 270 F.3d at 1178; *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).  The ALJ must discuss, at some level, how the evidence of record contradicts the treating physician's diagnosis.  *See Gudgel*, 345 F.3d at 470.

Dr. Mkrdichian's opinions are based on a long history of treating Mr. McCance before and after his surgery, and Dr. Mkrdichian continues to administer Mr. McCance's medication regimen and oversees the objective testing of his brain tumor.  Dr. Song's opinion that the "neurological exam showed no significant deficits" and finding that Mr. McCance had not experienced any seizures in the past four years is supported by the other evidence of record, including the treatment records of Dr. Mkrdichian.  In addition, Dr. Brown's opinion that Mr. McCance would only have a "slight difficulty in carrying out detailed instructions" and a "slight difficulty in responding appropriately to work pressures in a usual work setting and changes in a routine work setting," as relied on by the ALJ in his decision, R. at 17, is supported by the objective medical findings and

opinions.  Although Dr. Mkrdichian wrote in the December 4, 2000 letter that Mr. McCance's condition was not likely to improve and would continue, no changes in the tumor had been noted in the previous four and a half years since the surgery and radiation treatment had successfully treated the tumor.

In referencing the opinions of Drs. Gaddy and Roush, the ALJ cited 20 C.F.R. § 404.1527(e), which sets forth guidelines for the use of non-examining expert testimony.  As required under § 404.1527(e), the ALJ explained the weight that he was giving to the opinions of Drs. Gaddy and Roush and did not rely on their opinions to the exclusion of the other medical evidence of record, as suggested by Mr. McCance.  After setting forth Mr. McCance's RFC, the ALJ reasoned, "These physical and mental work-related limitations are not materially inconsistent with the prior determinations and opinions of non-examining State Agency medical and psychological consultants who also found that the claimant medically improved to the extent that he was no longer disabled under the Social Security Law (Exhibits 12F and 14F) (20 CFR 404.1527(f)(; SSR 96-6p)."  R. at 19.  The ALJ relied on the non-examining opinions only to the extent necessary to reaffirm the decision he had already made based on the other medical evidence of record, including Dr. Mkrdichian's opinions.

The only opinion of Dr. Mkrdichian to which the ALJ does not appear to give full credit is the statement in the December 4, 2000 opinion that "[d]ue to memory loss he is considered disabled from all employment."  R. at 248.  First, this disability opinion appears to be based largely, if not exclusively, on Mr. McCance's self-reported subjective complaints; it does not appear that Dr. Mkrdichian performed any examination of Mr. McCance's memory abilities.  In contrast, the objective tests performed by Dr. Song and Dr. Brown showed Mr. McCance had normal intelligence

and memory.  *See*  20 C.F.R. § 404.1527(d)(2) (providing that the ALJ will give a treating source

opinion controlling weight if the ALJ finds "that a treating source's opinion on the issue(s) of the

nature and severity of your impairment(s) is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence [of]

record").  For example, Dr. Brown reported that Mr. McCance's intelligence testing and memory

testing showed that his cognitive abilities were within the average range with an IQ score ranging

from 102 to 103 and with the Wechsler Memory Scale-III showing that he had an average memory.

Dr. Brown concluded that Mr. McCance had slight difficulties in performing complex tasks and

responding to work pressures and changes.  This opinion and the findings are consistent with Dr.

Song's finding that Mr. McCance had intact short term memory, abstract reasoning, and reading

ability.  Under the regulations, because these clinical findings and opinions are in conflict with Dr.

Mkrdichian's opinion that Mr. McCance has disabling short term memory problems, the ALJ was

justified in not giving that particular opinion controlling weight.

Moreover, the determination of whether Mr. McCance is able to work in light of his

disability is an administrative decision reserved to the ALJ and a medical source opinion on that

issue is not entitled to any deference.  *See* 20 C.F.R. § 404.1527(e) (providing that the final

responsibility for deciding a claimant's RFC is reserved to the Commissioner).[4]  Accordingly, the

---

[4] 20 C.F.R. § 404.1527(e) provides:
Medical source opinions on issues reserved to the Commissioner. Opinions on some issues, such as
the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section,
but are, instead, opinions on issues reserved to the Commissioner because they are administrative
findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) Opinions that you are disabled. We are responsible for making the determination or decision about
whether you meet the statutory definition of disability. In so doing, we review all of the medical
findings and other evidence that support a medical source's statement that you are disabled. A
statement by a medical source that you are "disabled" or "unable to work" does not mean that we will
determine that you are disabled.

Court finds that the ALJ did not err in determining that Mr. McCance's condition had medically improved.

## B. Credibility Determination

Mr. McCance argues that the ALJ's decision was erroneous because the credibility determination concerning Mr. McCance's disability did not consider the factors required under Social Security Ruling 96-7p.

Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms and how they affect the claimant's daily life and ability to work. 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. 20 C.F.R. § 404.1529(a). The Social Security regulations establish a two-part test for determining whether complaints of symptoms contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the

---

(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

20 C.F.R. § 404.1527(e)

intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

The ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)    The individual's daily activities;
(2)    Location, duration, frequency, and intensity of pain or other symptoms;
(3)    Precipitating and aggravating factors;
(4)    Type, dosage, effectiveness, and side effects of any medication;
(5)    Treatment, other than medication, for relief of pain or other symptoms;
(6)    Other measures taken to relieve pain or other symptoms;
(7)    Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). In making the credibility determination, Social Security Ruling 96-7p dictates that the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p at *1. The Ruling provides that the "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see Steele v. Barnhart*, 290 F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887. Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence.'" SSR 96-7p at *6. In addition, daily activities such as washing dishes, doing laundry, and preparing dinner do not

necessarily undermine or contradict a claim of disability. *See Zurawski*, 245 F.3d at 887 (citing *Clifford*, 227 F.3d at 872).

"[T]he adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p. As the Seventh Circuit has stated, "because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations omitted). Generally, an ALJ's credibility determination will not be overturned unless it was "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In his decision, the ALJ concluded that Mr. McCance's "statements concerning the continued extent and severity of his impairments, particularly his brain tumor and cognitive disorder, not otherwise specified, and their impact on his ability to work is not entirely credible or supported by the medical evidence (20 CFR 404.1529; Social Security Ruling 96-7p)." R. at 19. Prior to making that conclusion, the ALJ addressed Mr. McCance's "newly alleged loss of short and long term memory," noting the medical evidence of record contradicting Mr. McCance's allegations. *Id*. The ALJ recognized that the psychometric testing showed a General Memory Index Score of 91, but that there was no indication that Mr. McCance could not carry out routine daily activities, maintain social functioning, or understand, remember or carry out at least simple, routine tasks. In the body of his decision, the ALJ relied on the clinical findings of Dr. Brown who performed a psychological evaluation of Mr. McCance on May 6, 2002. In his decision, the ALJ considered Mr. McCance's daily activities, his use of Tegretol, and his alleged limitations due to fatigue and memory loss and

their impact on his daily life.  The Court finds that the ALJ adequately considered the factors set forth in 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling 96-7p.

At the hearing, the ALJ questioned why Dr. Mkrdichian noted in his reports that Mr. McCance was doing well and had no complaints of memory loss.  Mr. McCance responded that he had mentioned his complaints to Dr. Mkrdichian but that Dr. Mkrdichian took them "more as a normal result of the brain surgery."  R. at 345.  The ALJ further inquired about the impact of the Tegretol on his memory and asked what the impact of his memory problems is on his daily life.  Mr. McCance explained, "I wear out easy, but I haven't been working so, I don't know if that would have something to do with it, or if it's just."  R. at 346.  He testified that he has to write things down but still often forgets to do them anyway.  He also stated that he remembers a conversation with a person for at least the same day.  He explained that he volunteered for the Griffith Isaak Walton league but only took on tasks that do not require concentration and that he would need someone to phone to remind him about special meetings.

Nevertheless, Mr. McCance's activities demonstrate that his memory loss was not completely disabling.  Mr. McCance testified that he is able to care for his own personal and household needs, such as preparing simple meals, doing laundry, and shopping without assistance. He also went fishing, practiced archery, and volunteered at a club on a daily basis, performing maintenance activities such as mowing the lawn.  This ability to perform simple tasks is consistent with the ALJ's findings.  The ALJ credited Mr. McCance's memory loss to a reasonable degree by including restrictions against complex tasks and more than low stress environments, consistent with Dr. Brown's examination findings and opinion and Mr. McCance's household and volunteer activities.

Mr. McCance's only argument in his opening brief in support of his credibility is the conclusion that his statements of memory loss are credible based on the "level or frequency of treatment and its consistency with the level of complaints." Pl. Br. at 16. However, the only evidence offered in support are his routine six-month MRIs and visits to Dr. Mkrdichian as well as his medication. However, the fact of the routine visits, without more, does not support his claims of memory loss, and Dr. Mkrdichian's notes do not document any complaints of memory loss until December 2000. Mr. McCance also notes that in August 2000 and November 2000, the non-examining physicians found Mr. McCance "credible" regarding his symptoms in their Physical Residual Functional Capacity Assessments. However, the opinion of these non-examining physicians is not supported by the record as a whole, as set forth above.

The Court finds that the ALJ adhered to the guidelines in SSR 96-7p and that the ALJ's credibility determination is supported by substantial evidence and was not patently wrong.

## C. RFC Finding

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. This is an administrative assessment of the extent to which an individual's medically determinable impairments, including any related symptoms or subjective complaints, such as pain, may cause physical or mental limitations affecting the individual's capacity to do work-related activities. It is the maximum remaining ability to do sustained full-time work activities on a regular and continuing basis. *See* 20 C.F.R. § 404.1545; SSR 96-8p.

In this case, the ALJ found that Mr. McCance has the RFC to perform a limited range of light work, provided such work does not involve more than occasional postural limitations, and work which is not complex (i.e., only one, two or three step tasks) and does not involve more than low stress work tasks.

Mr. McCance argues that he is not capable of performing substantial gainful activity because his non-exertional limitations prevent him from sustaining any jobs. Specifically, Mr. McCance argues that he is not capable of performing light work because of his need for unscheduled breaks to nap, memory deficits, and difficulty in speaking.

Mr. McCance points to various evidence in the record in support of his need for unscheduled breaks to nap. In his Report of Continuing Disability Interview, Mr. McCance wrote that the Tegretol makes him "tired" and that "it is difficult to make a whole day without an afternoon nap." R. at 125. Similarly, Mr. McCance's sister completed a form for the Disability Determination Bureau and wrote that Mr. McCance took naps "a couple a day–sometimes more–app. 1 hour long." R. at 139. In September 2000, Mr. McCance stated in a Reconsideration Report for Disability Cessation that he "feel[s] that [his] strength and endurance are severely impaired probably from the medication." R. at 152. At the hearing, the ALJ inquired about Mr. McCance's physical condition, and Mr. McCance responded, "I wear out easy, but I haven't been working so, I don't know if that would have something to do with it, or if it's just." R. at 346. He also stated that he usually rests after three to four hours of activity and then he either sits down or takes a nap for thirty or forty minutes. He stated that he usually takes one nap a day.

Mr. McCance also claims that his short-term memory problems prevent him from competitive work. Mr. McCance argues that the evidence of him volunteering with the league does

not indicate that he is capable of sustaining a job because he only participates in volunteer activities that will not require much out of him.  Mr. McCance notes that he reported to the disability hearing officer that he gets distracted when doing an activity and will forget what he was doing.  R. at 51, 63.  Mr. McCance points to the testimony of the VE who stated that "if there were memory loss across the board, it would certainly preclude the ability for being able to consistently sustain the minimally required work effort for any type of occupation."  R. at 365.

Having reviewed the ALJ's decision and the evidence of record, the Court finds that the ALJ's RFC determination is supported by substantial evidence.  In his decision, the ALJ acknowledges Mr. McCance's testimony regarding his short and long-term memory loss, noting that Mr. McCance has to write everything down or he will forget appointments, that friends will call him all the time to remind of him of future events, and that he forgets why he is going into a room.  He further noted the testimony that Mr. McCance is easily fatigued and his testimony that he has difficulty with concentrating and completing tasks.  The ALJ acknowledged Mr. McCance's use of Tegretol and the absence of recent seizures.  Regarding his daily activities, the ALJ observed that Mr. McCance lives with his father in an apartment and can clean, shop, and cook, that he fishes and participates in archery, and that he volunteers at the league to do activities such as mowing the lawn.

As discussed above in Part B, the ALJ's credibility determination was proper when he found that Mr. McCance's "statements concerning the continued extent and severity of his impairments, particularly his brain tumor and cognitive disorder, not otherwise specified, and their impact on his ability to work is not entirely credible or supported by the medical evidence."  R. at 19.  Notably, the only documentation of Mr. McCance's problems with memory and concentration from Dr.

30

Mkrdician are in his December 4, 2000 letter.  Also noted in Part B, this opinion appears to be largely, if not entirely, based on self-reported statements of Mr. McCance.

The ALJ also engaged in the "special technique" required by 20 C.F.R. § 404.1520a when evaluating mental impairments.  Section 404.1520a requires the ALJ to first evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment."  20 C.F.R. § 404.1520a(b)(1).  Once the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [such] findings in accordance with paragraph (e) of this section."  *Id*.

Next, the ALJ "must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of this section and record [the] findings as set out in paragraph (e) of this section."  *Id*. at § 404.1520a(b)(2).  In rating the degree of functional limitation, the ALJ must consider "all relevant and available clinical signs and laboratory findings, the effects of [the] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id*. at § 404.1520a(c)(1).  The ALJ rates the degree of limitation based on the extent to which the impairment interferes with the ability to function independently, appropriately, effectively, and on a sustained basis.  The ALJ rates four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id*. at § 404.1520a(c)(3).  In the first three areas, the ALJ utilizes a five-point scale: none, mild, moderate, marked, and extreme, and in the fourth area, the ALJ uses a four-point scale: none, one or two, three,

four or more. *Id*. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." *Id*.

After the ALJ rates the degree of functional limitation resulting from the impairment, the ALJ must determine the severity of the mental impairment. *See id*. at § 404.1520a(d). If the ALJ rates "the degree of [] limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities . . . ." *Id*. at § 404.1520a(d)(1). If the mental impairment is found to be severe, further steps are required. *See id*. at § 404.1520a(d)(2)-(3).

At the ALJ hearing level, this technique is to be documented in the decision. *See id*. at § 404.1520a(e). More specifically:

> At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

*Id*. at § 404.1520a(e)(2).

In this case, the ALJ first noted that, although the psychometric testing showed a General Memory Index Score of 91, there was no indication that Mr. McCance could not carry out routine daily activities, maintain social functioning or understand, or remember or carry out at least simple, routine tasks. The ALJ then found, using the special technique, that, under the "B" criteria of the Mental Disorder listings, Mr. McCance would have only "slight" limitations in activities of daily living and in maintaining social functioning and would have "moderate" difficulties in maintaining

concentration, persistence, or pace.  Finally, he noted that there was no evidence of episodes of decompensation.  In addition, he found that the evidence did not establish the presence of the "C" criteria.  Accordingly, the ALJ properly utilized the special technique and then further incorporated the limitations of his severe cognitive disorder by modifying the range of light work Mr. McCance was found to be able to perform to include the non-exertional limitations.

Mr. McCance argues that the ALJ erred in equating a "slight difficulty" in carrying out detailed instructions with his memory loss, reasoning that the ability to perform simple one, two, three-step tasks is irrelevant when the claimant is incapable of remembering what he was doing in the first place.  However, the limitations imposed by the ALJ are supported by substantial evidence in the record, including the objective findings of examining physicians Dr. Brown and Dr. Song and the ALJ's credibility determination.  Notably, Dr. Mkrdician did not offer an opinion on Mr. McCance's memory loss or concentration other than based on Mr. McCance's subjective reports.

Mr. McCance further points to Dr. Brown's finding that Mr. McCance's cognitive functioning "deficits are diffuse and mild but appear to undermine his daily functioning."  R. at 316. However, this statement of Dr. Brown's is not inconsistent with the ALJ's determination.  The ALJ has accounted for the non-exertional limitations alluded to in Dr. Brown's conclusion by modifying the RFC for light work to require that the work be not complex (i.e., only one, two or three step tasks) and not involve more than low stress work tasks.  In addition, when the above-cited conclusion is read within the context of the substance of Dr. Brown's entire opinion, the conclusion that Mr. McCance's daily functioning is undermined by his cognitive functioning does not impose any limitations greater than those imposed by the ALJ.

Accordingly, the ALJ's RFC determination is supported by substantial evidence of record.

### D.  Step 8–Significant Jobs in the Economy

At Step 8 of the analysis, the burden shifts from the claimant to the Commissioner to prove that there are jobs existing in significant number in the national economy that the claimant can perform, consistent with the claimant's residual functional capacity, age, education, and work experience.  *See* 20 C.F.R. § 404.1594(f)(8).  Mr. McCance asserts that the Commissioner has not met this burden at Step 8.

In his decision, the ALJ considered Mr. McCance's age, education, and vocationally relevant past work experience in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e)(2).  The ALJ observed that Mr. McCance was 49 years old at the time of the decision, that he could perform a range of light work, that he has a high school education, and that he has transferable skills of the ability to do sequential processes from skilled work previously performed.  The ALJ concluded that Mr. McCance could perform a significant range of light work, as defined in 20 C.F.R. § 404.1567.  Because the ALJ found that Mr. McCance could not perform the full range of light work due to certain exertional and/or non-exertional limitations, he utilized the opinion of an impartial vocational expert to determine whether Mr. McCance could perform a significant number of jobs in the economy.

At the October 2002 hearing, the ALJ posed a hypothetical to the VE that took into account Mr. McCance's mental residual functional capacity, his physical residual functional capacity, Mr. McCance's past work, a birth date in 1953, and a high school education.  In posing that hypothetical, the ALJ specifically directed the VE to consider Exhibit 15F in the administrative record, which is a Medical Source Statement of Ability to Do Work-Related Activities (Mental) completed by Dr.

Brown, and which specifically identifies ten types of limitations and asks the medical source to rate them on the scale of none, slight, moderate, marked, and extreme. Dr. Brown rated Mr. McCance as either none or slight in each category. In addition, the ALJ specifically directed the VE to consider Exhibit 14F in the administrative record, which is an advisory Physical Residual Functional Capacity Assessment, completed by Dr. Gaddy. By incorporating these documents, the ALJ's hypothetical provided the VE with all the credited limitations, mental and physical. *See Young*, 362 F.3d 995, 1004 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2002); *Steele*, 290 F.3d at 942.

In response, the VE testified that a person with Mr. McCance's RFC and relevant vocational profile could perform approximately 10,000 semi-skilled assembly jobs and 8,000 semi-skilled inspection jobs in the regional Chicago metropolitan/Northwestern Indiana economy. He further testified that, regarding unskilled positions, the same person could perform 10,000 general packing and hand packing jobs at the light level, 8,000 assembly jobs, and 4,000 inspection jobs. The VE testified that his testimony was consistent with the DOT. As a result, the ALJ found that the listed jobs are consistent with the DOT and the Selected Characteristics of Occupations ("SCO") and that there are a significant number of jobs in the national economy that would accommodate Mr. McCance's impairment limitations. *See* 42 U.S.C. § 423(d)(2)(A), (f)(1); 20 C.F.R. § 404.1566(a).

The Court has already found that the ALJ's credibility determination and RFC finding are supported by substantial evidence; therefore, the VE's testimony was given in response to a hypothetical question that accurately portrayed Mr. McCance's limitations and vocational profile. The ALJ justifiably relied on the VE's conclusions. *See Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Cass v. Shalala*, 9 F.3d 552, 556 (7th Cir. 1993).

35

Mr. McCance makes two specific arguments regarding the ALJ's Step 8 determination. First, he argues that the ALJ failed to follow the requirements of Social Security Ruling 00-4p when relying on the VE's testimony.  Social Security Ruling 00-4p requires that an ALJ

> [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and [e]xplain in the determination or decision how any conflict that has been identified was resolved.

SS Ruling 00-4p, at *1.  The Ruling further explains that

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

*Id.* at *2.

Mr. McCance also argues that the ALJ unreasonably relied on the VE's testimony because the VE also testified that the semi-skilled jobs are not very complex but are somewhat detailed.  Mr. McCance concludes that this testimony is in conflict with the ALJ's limit of work to simple one, two, three-step jobs, reasoning that, because of his memory loss and concentration problems, he would not be able to perform jobs that would be "somewhat detailed."  He also argues that there are no descriptions for general assembly, general inspection, or general hand packager and instead looks at the job description for "general assembler-installer," which is categorized as medium work with a requirement of a Specific Vocational Preparation of 6.

36

However, the VE testified that his testimony was consistent with the information contained in the DOT, fulfilling the mandate of SSR 00-4p. On cross-examination, Mr. McCance's counsel elicited further testimony from the VE clarifying the nature of the work the VE found that Mr. McCance could perform and the limitations regarding complexity and detail. The VE testified that the assembly and inspection jobs that he identified involved some attention to detail but felt that the individual could still perform them. He explained that, given the fact that the individual had "just a slight loss of ability" to deal with complex work, as performed in the past work of a millwright, the individual should be able to perform the assembly jobs because "vocationally it appears that he should be able to assemble something that requires a sequential placement of all parts. Not to get them out of order, to make sure they fit in a proper orientation. The same thing with inspection. The inspection jobs are actually easier, because the defects would be noted on some kind of a spec sheet, and they would either be, or not be there." R. at 378-79. Therefore, the VE provided sufficient explanation during the hearing of the differences between his testimony and the definitions in the DOT. Notably, counsel for Mr. McCance never requested further information on the DOT listings or the consistency of the VE's testimony.

Second, Mr. McCance argues that the ALJ ignored the VE's qualification that an individual would not be able to sustain work if his condition of seizures were not controlled. Mr. McCance points to the VE's opinion that the hypothetical individual with seizures would be able to perform the work the VE had already identified as long as the seizures were controlled. Mr. McCance argues that the ALJ erred in finding that he could perform the jobs identified by the VE because, even though his seizures are controlled with the Tegretol, because the side affects of the medication affect his ability to concentrate and cause him to be fatigued. However, the Court has already found that

37

the ALJ properly considered Mr. McCance's complaints of fatigue and difficulty concentrating. Therefore, the ALJ properly relied on the VE's testimony that an individual with Mr. McCance's RFC and vocational history could perform the identified work if his seizures were controlled.

Finally, in his Reply, Mr. McCance argues that the ALJ failed to take into consideration the VE testimony that "if there were memory loss across the board, it could certainly preclude the ability for being able to consistently sustain the minimally required work effort for any type of occupation." R. at 365. However, there is no evidence that Mr. McCance suffered memory loss "across the board," nor does Mr. McCance suggest any such evidence in his brief. The Court has found that the ALJ has properly taken into account Mr. McCance's non-exertional limitations in determining his RFC.

The Court finds that the ALJ did not err at Step 8 of the analysis.


### CONCLUSION

The Court finds that the decision of the ALJ is supported by substantial evidence and that the decision, adopted by the Commissioner, was reasonable in light of the testimony and evidence. Therefore, the Plaintiff's request to reverse the ALJ's decision and/or to remand for further proceedings [DE 16] is **DENIED**. The decision of the ALJ is **AFFIRMED** in all respects.

SO ORDERED this 14th day of March, 2006.


s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record